UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――x

| | |
|---|---|
| In re: | Confirmed Chapter 11 |
| KARTA CORP. | 02-22028 (ASH) |
| KARTA CONTAINER & RECYCLING, INC. | 02-22029 (ASH) |
| GLOBAL RECYCLING & COLLECTION, INC., | 02-22030 (ASH) |
| | (Jointly Administered) |
| Debtors. | |

―――――――――――――――――――――――――――――x

PASQUALE CARTALEMI, individually and in his
capacity as a shareholder of Karta Industries, Inc. and
as a partner of P&K Realty Co.,

           Appellant,

       -against-         06-Civ-3442 (CM)

KARTA CORP., KARTA CONTAINER &
RECYCLING, INC., GLOBAL RECYCLING &
COLLECTION, INC., KENNETH CARTALEMI,  On Appeal from the
MARIA CARTALEMI and GLOBAL LAND, INC.,  Bankruptcy Court

           Appellees.

―――――――――――――――――――――――――――――x

**DECISION AND ORDER MODIFYING AND AFFIRMING
ORDER OF BANKRUPTCY COURT CONFIRMING DEBTORS'
FIFTH AMENDED JOINT PLAN OF REORGANIZATION**

McMahon, J.:

  By an Order of this Court dated May 5, 2006, granting Appellant's Motion for an Expedited Appeal, Appellant Pasquale Cartalemi, Sr. ("Pat") seeks appellate review of an Order of the Bankruptcy Court dated April 28, 2006, confirming Debtor's Fifth Amended Joint Plan of Reorganization (the "Plan") in the underlying bankruptcy action. In particular, Pat challenges provisions in the Plan which release certain Non-Debtors (including his son, Kenneth or "Ken" Cartalemi) from all claims held by Pat, and which provide for the Plan to be funded in part by a Non-Debtor corporation, in which Appellant has a 50% equity interest.

  Appellees maintain that the appeal is barred by the doctrine of equitable mootness, and

that the challenged provisions of the Plan are proper under the law of this Circuit and the New York Business and Corporation Law.

The Court concludes that Appellant's appeal is not equitably moot. However, in light of the unique facts and circumstances presented in this matter, the Court finds that the challenged provisions are supported by the controlling law. I thus affirm the Bankruptcy Court's confirmation of the Plan.

Under a separate docket number (06 Civ. 3602), Pat appeals from Judge Hardin's Judgment dated May 10, 2006, permanently enjoining him from prosecuting a certain action in the New York State Supreme Court. The appeals were consolidated by Judge Brieant for briefing and oral argument. A separate decision will issue concerning the injunction against the prosecution of the state court action.

## Issues on Appeal

The issues on this appeal are:

- Whether this appeal is equitably moot on the basis of the closing of certain transactions approved in the Plan?

- Whether the Bankruptcy Court erred in granting a Non-Debtor release and channeling injunction of all claims held by Appellant?

- Whether the Bankruptcy Court erred in permitting Debtors to use all or substantially all of the property of Non-Debtor, Karta Industries, Inc., to fund the Plan and to guaranty payments under the Plan?

## Facts

Factual Background

In February 1970, Pat Cartalemi formed Karta Diner, Inc., for the purposes of acquiring a diner in Croton-on-the-Hudson, New York. On or about February 9, 1981, Karta Diner acquired a parcel of property located at 1017 Lower South Street in Peekskill, New York (the "1017 property"). In April 1988, Karta Diner was renamed Karta Industries, Inc. ("KI"). Thereafter, Pat, who had initially been the sole shareholder of Karta Diner, assigned 50% of his equity interest in KI to his son Ken. Pat and Ken operated Ken-Mar Motors, an automotive repair business, on the property. They each owned 50% of Ken-Mar.

In November 1988, KI obtained a loan in the amount of $2,758,659, from the City of Peekskill Industrial Development Agency ("IDA"). The proceeds of the loan were used for the construction and operation of a recycling facility on the 1017 property. Under the Loan Agreement, KI conveyed title of the 1017 property to the IDA, and was granted a "lease back" of

the property from the IDA. Pat and Ken guaranteed the obligations under the Loan Agreement. At or around the same time, KI obtained permits from the City of Peekskill and other applicable government agencies to operate a recycling facility on the 1017 property.

On July 1, 1989, KI subleased the 1017 property to Ken-Mar and Karta Container & Recycling, Inc. ("Karta Container"). Karta Container, a recycling and roll-off container rental business, had been formed in January 1988 by Pat and Ken, who were each 50% shareholders. Karta Container operated the recycling facility on the 1017 property until it ceased operations in March 2000. At that time, Karta Corporation ("Karta Corp."), the successor-in-interest to Ken-Mar and Karta Container, which are now both defunct, assumed operations of the carting and recycling business. Both Karta Container and Karta Corp. are Debtors in the underlying bankruptcy action.

On July 23, 1984, Pat, Ken and other investors purchased a parcel of land adjacent to the 1017 property. Two years later, title to this second parcel, located at 1011 Lower South Street (the "1011 property"), was transferred to Travis Lane Association, another corporation in which Pat and Ken both had an equity interest. On July 27, 1998, Travis Lane transferred the 1011 property to Global Land, Inc., a real estate holding company owned by Kenneth, his wife Maria Cartalemi, and their children. Global Land paid approximately $950,000 for the property. Global Land then leased a portion of the 1011 property to one of the Debtors, Karta Corp. Karta Corp.'s recycling facility now operates on both the 1011 and 1017 properties, which are connected by a conveyor belt.

Finally, via a real estate holding partnership, P&K Realty Co., Pat and Ken purchased two parcels of land across the street from the 1017 and 1011 properties. While no formal lease agreements have been executed, these additional properties, located at 1014 and 1016 Lower South Street (the "1014 property" and the "1016 property") are used by Karta Corp. as parking lots for its recycling vehicles.

On September 1, 1992, Pat resigned from all corporate positions, including his position as president of KI and as an officer and director of Karta Container. He remains a shareholder in both corporate entities.

Kenneth Cartalemi and/or his wife, Maria Cartalemi, are President and/or Vice President of each of the corporate Appellees, Debtors Karta Corp., Karta Container, and Global Recycling & Collection, Inc. ("Global Recycling") (which owns various pieces of equipment leased by Karta Corp. and used in Karta Corp.'s business operations). They are also the officers of Non-Debtor Global Land, the owner of the 1011 property.

Procedural History

In January 2002, Debtors Karta Corp., Karta Container and Global Recycling voluntarily filed Petitions for Relief under Chapter 11. KI, the lessor (from the IDA) of the 1017 property, did not file for bankruptcy; all parties concede that this was to avoid defaulting on its IDA lease. Karta Corp., Karta Container and Global Recycling remained debtors-in-possession of their businesses.

On November 3, 1999, Pat commenced an action against Karta Container in the New York State Supreme Court, seeking repayment of a loan he allegedly had made to Karta Container (the "1999 state court action"). That action was still pending at the time Karta Container entered bankruptcy.

On April 28, 2002, Pat commenced an adversary proceeding against Karta Container in the Bankruptcy Court, seeking a declaration that he had an unsecured claim against Karta Container and that he was an equity security holder of Karta Container in the underlying bankruptcy matter (the "2002 adversary proceeding"). On July 18, 2003, the Bankruptcy Court recharacterized Pat's claims in both the 1999 state court action (which had been stayed) and the 2002 adversary proceeding as equity investments, rather than loans. Accordingly, Pat's claims against Karta Container were expunged.

In April 2005, the Bankruptcy Court approved and the District Court affirmed a Settlement between the City of Peekskill and Debtors, who had filed three adversary proceedings and an Article 78 proceeding against the City. Pursuant to the Agreement, Debtors granted the City the option to purchase both the 1011 property, and (in 2010 when the IDA loan is paid in full) the facility located on the 1017 property. To date, the City has not exercised its option with respect to the 1011 property.

On March 16, 2006, Pat commenced an action in the New York State Supreme Court against Non-Debtors Ken and Maria Cartalemi and Global Land, the owner of the 1011 property (the "2006 state court action"). Pat sought damages for alleged self-dealing and breach of fiduciary duty for requiring Karta Corp. to lease a portion of the 1011 property from Global Land, but not requiring Debtors to lease the 1017 property from KI or the 1014 and 1016 properties from P&K Realty, as well as for a purported disparity in rent charged to Karta Corp. on property 1011 and to Tarrytown R&T Corp. ("TRAT"), a company owned by Ken's cousins which is currently managing the recycling facility, on property 1017. Pat also sought damages for Ken's alleged failure to pay Pat proportionate proceeds from the sale of property 1011 to Global Land (which occurred in 1988); Ken's transfer of permits owned by KI; Ken and Maria's breach of fiduciary duty in connection with the Peekskill Settlement; and Ken and Maria's failure to obtain KI shareholder approval in connection with KI's guarantee of the Plan. Pat also accused Ken and Maria of oppressive and malicious conduct and fraud and deception. Pat sought imposition of a constructive trust on property 1011 and property 1070 (another parcel of land owned by Global Land), and an accounting of the income, rents and profits of KI, Travis Lane, P&K Realty and Global Land. Because the state court complaint did not name any

4

Debtors in the caption, the action was not removed to federal court.

On April 4, 2006, Debtors commenced an adversary proceeding in the Bankruptcy Court to enjoin Pat from proceeding with his 2006 state court action. On April 24, 2006, the Bankruptcy Court heard argument on Debtor's Application for Permanent Injunctive Relief, but reserved decision.

On April 27, 2006, the Bankruptcy Court confirmed Debtors' Fifth Amended Plan of Reorganization ("the Plan"), which provides for, *inter alia*, the payment of administrative and priority claims and a minimum 45% distribution to unsecured creditors. The Plan is to be funded by: (i) proceeds from the management of the Debtors' transfer station by TRAT; (ii) proceeds from equipment lease rental fees pursuant to an equipment lease agreement with TRAT; (iii) proceeds from the settlement of an insurance claim; (iv) proceeds from the Peekskill Settlement; (v) contributions of the Debtors' principals and affiliates; and (vi) proceeds from the sale of Karta Corp.'s roll-off hauling business.

The Plan also provides for a channeling injunction releasing all claims against certain Non-Debtors, including Ken, Maria, KI and Global Land (the "Released Parties"). Specifically, all claims of Creditors that are potentially viable against the Released Parties are to be channeled toward the Debtors' Estate and enjoined as to the Released Parties. (Plan at ¶ 6.4). A similar provision appeared in earlier versions of the Plan; the difference is that the final Plan defines "Creditor" more broadly than did earlier versions, and thereby expressly applies to Pat. In particular, the definition was expanded to include the holder of a claim that has been expunged, disallowed and/or recharacterized by the Court as other than debt, as well as persons or entities who failed to file Claims before the bar date previously set for the filing of claims. (Plan at ¶ 1.21).

In addition to confirming the Plan, the court indicated that it would permanently enjoin Pat's 2006 state court proceeding.

The following day, April 28, 2006, the Bankruptcy Court signed an Order confirming the Plan. Judge Hardin waived the 10-day stay that ordinarily applies to the sale of property under Bankruptcy Rule 6004(g). April 28, 2006, it should be noted, was a Friday.

On Tuesday, May 2, 2006– the second business day after the confirmation of the Plan– Debtors sold their Roll-Off Hauling Assets (including trucks, containers, and goodwill) to CRH Sanitation, an affiliate of CRP Sanitation, which had managed the Roll-Off Hauling business on an interim basis since July 1, 2005. Debtors also entered into a Management Services Agreement with TRAT, under which TRAT would formally take over Debtor's recycling operations upon receipt of confirmation from the IDA and Peekskill Job Development Agency.

The very same day, Pat filed a Notice of Appeal from the Bankruptcy Court's April 28 Order. He also filed an Order to Show Cause for an Expedited Appeal. The Order to Show Cause did not contain an application for a stay of any property sales. This Court directed

5

Appellees to show cause why the appeal should not be expedited.

Judge Brieant held a Show Cause hearing on May 5, 2006. At the hearing, Appellees moved to dismiss the appeal on the ground of equitable mootness. Both the City of Peekskill and the Official Committee of Unsecured Creditors of Karta Corp., Karta Container, and Global Recycling joined Appellees in opposition to appeal. All parties agreed, however, that, if the appeal were to proceed, it should be expedited. Judge Brieant denied Appellees' Motion to Dismiss without prejudice, and granted Appellant's unopposed application for an Expedited Appeal. In addition, he stayed that portion of the Plan that released the Non-Debtors from any claims of the Appellant, except claims that were precluded by the Court's 2005 Order approving the Settlement Agreement between Debtors and the City of Peekskill.

On May 10, 2006, the Bankruptcy Court entered a Judgment permanently enjoining Pat from prosecuting his 2006 state court action. On May 11, 2006, Pat filed a Notice of Appeal of the Bankruptcy Court's May 10 Judgment.

Pat's appeal of the Bankruptcy Court's April 28 Order and May 10 Judgment were consolidated and assigned to me. I heard oral argument on May 12, 2006.

**Standard of Review**

This Court reviews the Bankruptcy Court's conclusions of law *de novo*, and its findings of fact for clear error. In re Stoltz, 315 F.3d 80, 87 (2d Cir. 2002).

**Legal Analysis**

**A.** **Equitable Mootness**

Appellees contend that the appeal from the confirmation of the Plan should be dismissed as equitably moot. While Judge Brieant denied Appellees' Motion to Dismiss on this ground at the Show Cause hearing, he did so without prejudice, so that Appellees could renew their argument before this Court.

"Equitable mootness is a prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented." In re Metromedia Fiber Network, Inc., 416 F.3d 136, 144 (2d Cir. 2005). The Second Circuit has held that, in bankruptcy cases, "An appeal should [] be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." Id. at 143 (quoting In re Chateaugay Corp., 988 F.2d 322, 325 (2d Cir. 1993)). Unlike constitutional mootness which bears on the Court's power or ability to alter a particular outcome, equitable mootness refers to the Court's *willingness* to upset a reorganization plan based on fairness considerations. Id. at 144 (citing In re UNR Ind., 20 F.3d 766, 769 (7th Cir. 1994)).

Appellees argue that, pursuant to the Confirmation Order, which authorizes Debtors to

6

take all steps necessary to effectuate the Plan, the transactions contemplated by the Plan have been substantially consummated and cannot be undone. (See Tr. 5/5/06 Show Cause Hearing at 19). For example, on May 2, 2006, Debtors and CRH Sanitation closed on the sale of Debtor's Roll-Off Hauling trucks, containers and goodwill. (Decl. of Kenneth Cartalemi at ¶ 13). CRH Sanitation is now in possession of these assets. Certain of Debtors' secured creditors have received payments as provided for under the terms of the Asset Purchase Agreement, and a portion of the sale proceeds have been paid to the Debtors' Estate for distribution to Debtors' Creditors. (Id. at ¶¶ 13-15). Likewise, pursuant to the Order, TRAT has commenced managing Karta Corp.'s recycling facility as an agent of Karta Corp., pending formal consent from the IDA. (Id. at ¶¶ 16-18). In addition, CRH Sanitation and TRAT have entered into two collective bargaining agreements with the union; the Department of Environmental Conservation ("DEC") has entered into a settlement with Debtors, whereby a portion of DEC's $3 million claim against Debtors for non-compliance with environmental regulations will be waived upon assurance that TRAT (rather than Karta Corp.) will operate the recycling facility; TRAT has obtained permits to operate the recycling facility; and CRH Sanitation has made payroll tax payments as required by the IRS. According to Appellees, the transactions have proceeded to the point where "unscrambling the egg" would be inequitable if not impossible.

In prior cases, including most recently Metromedia, the Second Circuit recognized that, dismissal on grounds of equitable mootness is only appropriate when the "appellant has made no effort to obtain a stay and has permitted 'such a comprehensive change of circumstances to occur as to render it inequitable'" for the court to reach the merits of the appeal. In re Chateaugay Corp., 988 F.2d at 325 (citations omitted). Application for a stay of the Bankruptcy Court's action is not a per se requirement to avoiding dismissal, particularly where appellant has sought expedited review. See Matter of Crystal Oil Co., 854 F.2d 79 (5 Cir. 1988); see also In re Metromedia Fiber Network, Inc., 416 F.3d at 144-45; In re U.S. Airways Group, 369 F.3d 806, 810 (4th Cir. 2004).

In stark contrast to Matter of Crystal Oil Co., where the appeal was dismissed as equitably moot because appellant allowed ten months to lapse before filing an appeal, and Metromedia, where the appellant failed to seek expedited review of the appeal that was pending for over a year, there can be no suggestion that Pat sat "idly by" after the Bankruptcy Court confirmed the Plan.

The hearing was held on April 27, 2006; the Order was signed on April 28. Ordinarily, anyone who objected to the Order could expect a 10 day automatic stay of implementation of the Plan pursuant to Bankruptcy Rule 6004(g). Indeed, in the Plan itself, the "Effective Date" is the earlier of 10 days after the Confirmation Order becomes a final order and either (i) the date by which the Debtors have obtained sufficient funds to satisfy their obligation under the Plan or (ii) the exercise by the City of Peekskill of the 1011 Option. (Plan at ¶ 1.29). Given the pendency of this appeal, the "Effective Date" has not passed.

However, in his April 28 Order, Judge Hardin waived the automatic stay for sales of assets, which was obviously intended to permit those sales to go forward immediately. Pat never

came to this Court seeking a stay of property sales. Instead, he sought an expedited appeal, and did so on the second business day after entry of the Order. The appeal was expedited.

Thus, Appellees' equitable mootness argument comes down to a single proposition: by failing to seek a stay of the consummation of sales either on the day the Order was entered (a Friday) or on the first business day thereafter, Appellant has equitably dis-entitled himself from proceeding with this appeal.

The Second Circuit's approval of the doctrine of equitable mootness does not go so far.

It is true that there were things Pat could have done on April 28 or May 1 to try to forestall the property sales that were apparently consummated on May 2. For example, he could have come to this court and sought a stay of those sales. However, the Second Circuit has held that seeking a stay is not a necessary precondition to avoiding dismissal on the ground of equitable mootness. Matter of Crystal Oil Co., 854 F. 2d 79; *see also* Metromedia Fiber Network, Inc., 416 F. 3d at 144-45; In re U.S. Airways Group, 369 F. 3d at 810. Instead of seeking a stay, Pat sought an expedited appeal. He did so quickly. Debtors and their affiliates clearly sought to moot any such appeal by consummating their transactions prior to the Effective Date of the Plan, knowing that Pat had objected to aspects of the Plan relating to those sales and that his time to appeal had not yet run. They do not stand in a superior equitable position to Appellant, and so are not entitled to dismissal of this action on equitable grounds.

B.  **Non-Debtor Releases**

Appellant's primary contention on appeal from Judge Hardin's confirmation of the Plan is that the Plan's Non-Debtor Release provisions – which effectively release Ken, Maria, KI, and Global Land, among other Non-Debtors, from all of Pat's state law claims– are illegal and should be overturned.

Section 6.4 of the Fifth Amended Plan of Reorganization, which was confirmed by the Bankruptcy Court on April 28, 2006, provides:

> [U]pon Confirmation and upon the distributions as contemplated herein, *all Claim of Creditors that are potentially viable against the Released Parties*, specifically Claims supported by personal guarantees, or cross guarantees in the case of the Debtors' Affiliates, and/or claims purporting to allege any breach of fiduciary duty, whether styled as an action for money, a shareholder's derivative action, special proceedings for corporate dissolution, partnership or other accounting, action for fraudulent conveyance or otherwise, including but not limited to [the 1999 state court action, the 2002 adversary proceeding, and the 2006 state court action] or claims similar to those asserted in, could have been asserted in or should have been asserted in [any of the

8

> foregoing], are *channeled towards the Debtors' Estates*, shall be deemed satisfied by the distributions made under the Plan and eliminated and *specifically enjoined as to the Released Parties*.

(Plan at ¶ 6.4)(emphasis added). "Creditor" is defined as the holder of a claim within the meaning of the Bankruptcy Code. In the confirmed Plan (although not in prior drafts), the term expressly includes the holder of a claim that has been expunged, disallowed and/or recharacterized by the Court as other than debt, as well as persons or entities who failed to file Claims before the bar date previously set for the filing of claims. (Plan at ¶ 1.21). Pat is a "Creditor" within the meaning of the confirmed Plan – he had claims that were recharacterized as other than debt and expunged in 2003.

"In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan." In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2d Cir. 1992). In Metromedia, the Second Circuit held that, because the Bankruptcy Code does not expressly authorize non-debtor releases and they are subject to abuse, such releases are proper "only in rare cases." 416 F.3d at 141-42. The Metromedia Court further emphasized that, "No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique." Id. at 142.

Non-debtor releases have been approved by courts in this Circuit where, for example, the estate received substantial consideration in return for the release, and where the enjoined claims were "channeled" to a settlement fund rather than extinguished. Id. (citing In re Drexel Burnham Lambert Group, Inc., 960 F.2d at 293; In re Johns-Manville Corp., 837 F.2d 89, 93-94 (2d Cir. 1988)).

As the Metromedia Court recently noted, no cases in this Circuit address when a non-debtor release is "important" to a debtor's plan. 416 F.3d at 141. But whatever the definition, it is beyond dispute that the Non-Debtor Releases contained in the Plan and confirmed by the Bankruptcy Court are "important" to the Debtors' reorganization plan. Contrary to Appellant's assertion that Non-Debtor Release provisions appeared for the first time in the Third Amended Joint Plan of Reorganization, and thus were not integral to the Plan from its inception, the record demonstrates that even the earliest version of the Plan included language intended to bar claims against Ken and other Non-Debtors. The definition of "Creditor," however, was expanded to expressly reach Pat, in the Third Amended Joint Plan of Reorganization. By including the holder of a claim that has been expunged or recharacterized by the Court, the definition encompasses Pat's claims against Karta Container, asserted in both his 1999 state court action and 2002 adversary proceeding, which the Bankruptcy Court recharacterized as equity and subsequently expunged.

It is also true that, as Judge Hardin found, "Absent these releases [the parties would not] be able to confirm this plan." (Tr. 4/27/06 Bankruptcy Hearing at 17). The Plan includes a substantial financial contribution from and guarantee by Ken and Maria, and a waiver of all pre- and post- petition claims against Debtors by Ken and Maria and Global Land. The record makes

9

clear that the Released Parties have agreed to make significant contributions to the Debtors' estate *on the condition* that they are released from Creditors' claims. In the absence of the Non-Debtor Releases, the Released Parties will not contribute to the Plan.[1] Without the Plan contributions, the Debtors cannot fund the Plan or comply with other Plan obligations, and the Plan will unravel. Thus, the Non-Debtor Release provisions cannot be stricken from or carved out of the overall Plan. See Metromedia, 416 F.3d at 145.

However, it is precisely this conditioning of financial participation by non-debtors on releases that is subject to the sort of abuse foreseen by the Second Circuit in Metromedia. Anyone can devise a plan that involves contributions from non-debtors who (not surprisingly) would condition their participation on being shielded from *their* creditors. And just as every unhappy family is unhappy in its own way (Leo Tolstoy, *Anna Karenina*), every multi-debtor corporate bankruptcy can come up with some aspect of its situation that seems to it, and to its creditors, to be "unique." So it would be all too easy to bring many cases in under what the Second Circuit has said should be the very small Metromedia umbrella – which would make a plan facet that is supposed to be an exception swallow the rule against non-debtor releases.

Therefore, the mere fact of financial contribution by a non-debtor cannot be enough to trigger the right to a Metromedia/Drexel release of non-debtor claims.

So the challenge for a court is to parse the facts of the case before it to see whether a significant non-debtor financial contribution plus other unusual factors render a situation so "unique" that non-debtor releases are appropriate.

This is the rare case in which such factors exist – at least for releases of claims that relate to the carting and recycling business carried out by the Debtors and their affiliates.

The three Debtor corporations and their affiliates are all part of a single, integrated, closely-held family business. The capital assets of that business, including land, leases, buildings and equipment, are owned by or leased to a number of separate family corporations or partnerships, all of which are owned by Pat and Ken Cartalemi or by Ken Cartalemi and members of his immediate family. All those assets – including the properties across the street from the main recycling facility, where the trucks are parked – are employed in the Cartalemi carting business.

The bulk of the business' operations are carried out on two properties: the 1011 property (owned by Non-Debtor Global Land, in which Pat has no interest, but leased to Debtor Karta Corp.) and the 1017 property (owned by the Peekskill IDA and ground leased to Non-Debtor KI,

---

[1] As stated in the Plan, "If the Released Parties are forced to defend State Court lawsuits and to pay out relatively substantial amounts of money to creditors on debts that arose from the Debtors' businesses, it will be manifestly impossible for them to devote any financial resources towards the reorganization of the Estates." (Plan at ¶ 6.3).

of which Pat is a 50% shareholder, subleased to Debtor Karta Container, whose operations were later taken over by Debtor Karta Corp.). The buildings on the two properties are connected by a conveyor belt; the recycled material is taken in on one property and transferred to the other for processing as part of the same recycling operation. Likewise, all of the business' recycling trucks and equipment are stored on the 1014 and 1016 properties, which are owned by Non-Debtor P&K Realty, making these properties an integral part of the recycling business. The operating company (Debtor Karta Corp.) is the only one with employees and it pays all the expenses and taxes of the business, not only of the Debtors but also of any Non-Debtor corporations or partnerships whose assets are used in the operation of the business.

Ideally all of the relevant corporations – including KI, the owner of the ground lease with the Peekskill IDA – would have been put into bankruptcy to facilitate the reorganization of the business. But putting KI into bankruptcy would have violated the terms of the lease from the IDA (the owner of the 1017 parcel), thus permitting Peekskill – which was hostile to the recycling operation – to void the lease, render KI's ground lease worthless and shut down the entire Cartalemi business. The only way to reorganize the recycling operation was to do so "around" KI – keeping that corporation out of bankruptcy, but putting its sublessees (Karta Container and Karta Corp.) into Chapter 11, and devising a plan that would allow the entire business to go forward.

That is the plan the parties have devised and the Bankruptcy Court has approved. By preserving the vitality of the Cartalemi recycling business, the Plan, which is funded to a large extent by Ken and Maria Cartalemi and Global Land, benefits KI as much as it benefits Debtors. To the extent that the Non-Debtor releases to which Pat objects protect Ken, Maria, KI, Global Land, and other Non-Debtors from suits related to their roles in effecting this reorganization Plan, they are sensibly related to the purpose of reorganizing the business of the Cartalemi enterprises. To the extent that Ken and the other Released Parties conditioned their substantial financial participation in the reorganization[2] on protection from lawsuits arising out of their bankruptcy-related activities, the releases were important to the Plan. And because of the unique character of the Cartalemi empire (with a different corporation or partnership owning different assets that are used to run a single integrated enterprise) and the unique circumstance that prevented the business' management from putting KI into bankruptcy, such releases (i.e., releases from lawsuits arising out of bankruptcy-related activities) are exactly the sort of releases that should be sanctioned under Metromedia/Drexel.

Additionally, there is another uniqueness factor in this particular case: the involvement of

---

[2]And it was quite substantial, including but not limited to: non-debtor Global Land's waiver of all pre- and post- petition claims against Debtors, Non-Debtor Global Land's contribution of the proceeds from the sale of its property under the Settlement Agreement with the City of Peekskill; Non-Debtor Ken and Maria's waiver of all pre-petition unsecured claims and post-petition claims, and Non-Debtor Ken and Maria's personal monetary contribution to the Debtors' Estate in an estimated amount of $460,000. (See Disclosure Stmt.)

the City of Peekskill in this bankruptcy and the relationship of the reorganization of this business to the development of the Peekskill waterfront.

This case is remarkably similar to In re XO Communications, in which the Bankruptcy Court recently held, "The substantial consideration provided to the Class by the Secured Lenders, the identity of interest present [between the Debtors and Non-Debtors], and the necessity of the satisfaction of the Litigation Condition to the Plan process, all form the basis of a finding fully consistent with Metromedia's clarification on nondebtor releases." 330 B.R. 394 (Bankr.S.D.N.Y. 2005). In this case, as in XO Communications, the Non-Debtors have provided significant consideration, the Non-Debtor Releases are integral to the Plan, and, as the Bankruptcy Court found, "Non-Debtor Plaintiffs' interests are aligned in interest with the Debtor Plaintiffs with regard to the claims of [Pat]." (5/10/2006 Judgment for Plaintiffs at ¶ L). Accordingly, this Court upholds the Bankruptcy Court's confirmation of the Non-Debtor Release provisions of the Plan.

A necessary corollary of Metromedia must be that the releases offered to the Non-Debtors bear a reasonable relationship to the protection of the estate and go no further than necessary to protect those interests. Pat's counsel argues that the Non-Debtor releases are overbroad, in that they release the Non-Debtors (particularly Ken) from claims that Pat might assert that have no relationship to the operation of the reorganized business. To take an example, if Pat and Ken were in an automobile accident, Pat's position is that the release bars him from suing Ken for negligence in connection with that accident.

Section 6.4 of the Plan refers specifically to claims "supported by personal guarantees or cross guarantees in the case of the Debtors' Affiliates, and/or claims purporting to allege any breach of fiduciary duty, whether styled as an action for money, a shareholder's derivative action, special proceeding for corporate dissolution, partnership or other accounting, action for fraudulent conveyance or otherwise, including but not limited to [the 1999 state court action, the 2002 adversary proceeding, and the 2006 state court action][or similar claims] . . ." It is apparent that the intent of the parties drafting the release was to cover the sorts of claims that Pat had previously brought and was bringing against Ken and Maria and the Non-Debtor affiliates. Such claims would of course be related to the administration of the estate and the on-going reorganization. They are the sort of claims that can and should be subject to a Metromedia/Drexel release.

However, Section 6.4 prefaces all of this by saying ". . . all Claims of Creditors that are potentially viable against the Released Parties . . ." are released. Because this broad language could be construed as releasing claims that have nothing to do with the carting/recycling business, the language of the Release needs to be modified to limit the Non-Debtor Release to claims that are appropriately subject to a Metromedia/Drexel release.

**C.  Use of KI's Assets to Fund and Guarantee the Plan**

Appellant also argues that the Plan improperly relies on KI's assets to guarantee

payments and to fund the Plan, in violation of the New York Business and Corporation Law ("BCL"). Specifically, Appellant claims that, pursuant to BCL §§ 908 and 909, consent of two-thirds of KI's shareholders was required before KI could issue guarantees under the Plan and/or lease property 1017, first to Karta Corp. and later to TRAT. However, Pat, a 50% shareholder in KI, maintains that he never consented to these transactions.

Appellees contend that, because the challenged transactions furthered KI's corporate purpose, a shareholder vote was not required under §§ 908 or 909, which excepts from the general rule any transactions entered into in furtherance of a corporate entity's corporate purpose or made in the regular course of business. BCL § 908 provides:

> A guarantee may be given by a corporation, *although not in furtherance of its corporate purpose*, when authorized at a meeting of shareholders by two-thirds of the votes of all outstanding shares entitled to vote thereon. If authorized by a like vote, such guarantee may be secured by a mortgage or pledge of, or the creation of a security interest in, all or any part of the corporate property, or any interest therein, wherever situated.

Bus. Corp. § 908 (emphasis added). Similarly, BCL § 909(a) states:

> (a) A sale, lease, exchange or other disposition of all or substantially all the assets of a corporation, *if not made in the usual or regular course of the business actually conducted by such corporation*, shall be authorized only in accordance with the following procedure:
>
> (1) The board shall authorize the proposed sale, lease, exchange or other disposition and direct its submission to a vote of shareholders.
>
> (2) Notice of meeting shall be given to each shareholder of record, whether or not entitled to vote.
>
> (3) The shareholders shall approve such sale, lease, exchange or other disposition and may fix, or may authorize the board to fix, any of the terms and conditions thereof and the consideration to be received by the corporation therefore . . . by vote at a meeting of shareholders of . . . two-thirds of the votes of all outstanding shares entitled to vote thereon.

13

Bus. Corp. § 909(a) (emphasis added). Another BCL section provides that, subject to other provisions of the statute, a corporation "shall have power in furtherance of its corporate purposes . . . (5) to sell, convey, lease, exchange, transfer or otherwise dispose of, or mortgage or pledge, or create a security interest in, all or any of its property, or any interest therein, wherever situated . . . (7) to make contracts, give guarantees and incur liabilities . . ." Bus. Corp. § 202(a).

The Court agrees that KI's Board could, without any shareholder vote, authorize the use of insurance proceeds and proceeds from the Peekskill Settlement to guarantee the Plan, as well as sublease the 1017 property and transfer the operating permits for that property to fund the Plan. Each of these transactions was entered into in furtherance of KI's corporate purposes. KI was the holder of a lease (from the IDA) on the 1017 property. It clearly furthered KI's corporate purpose to keep the business that occupied the property pursuant to the IDA lease up and running. If Karta Corp. and its corporate affiliates were unable to reorganize, KI's own viability would have been compromised. Its position is no different than that of Ollag in Matter of Ollag Const. Equip. Corp., in which the district court found:

> The pledge of Ollag's assets was executed in an attempt to prevent the bankruptcy of its parents corporation and principal customer. If such were accomplished, Ollag would preserve its own viability and benefit financially by maintaining or increasing the volume of its rentals to Deplan. Thus, Ollag was acting to retain a customer and to further its won business interests. In addition, as previously observed, there existed a close business relationship and commonality of shareholders, officers, and directors between the two corporations. Under these circumstances, I conclude that Ollag's pledge of its corporate assets to secure its previous guaranty of the indebtedness of Deplan was in furtherance of its corporate purposes within the meaning of section 202(a)(7) of the BCL and that shareholder approval of such transaction was not required. Therefore, the bankruptcy judge's determination that section 908 of the BCL was the pertinent statutory provision must be reversed.

Matter of Ollag Cons. Equip. Corp., 446 F.Supp. 586, 593 (D.C.N.Y. 1978), *aff'd in part and rev'd in part by* 578 F.2d 904 (2d Cir. 1978). In affirming this portion of the district court's decision, the Second Circuit stated:

> We have little difficulty in disposing of the trustee's contention on his appeal that the security agreement was void because it did not further any of Ollag's corporate purposes and had not been ratified by Ollag's shareholders in accordance with N.Y. Bus. Corp. Law § 908. It is clear that the security agreement did in fact serve a valid corporate purpose by attempting to avert the bankruptcy of Ollag's parent and principal customer, Deplan. Accordingly, under N.Y.

> We have little difficulty in disposing of the trustee's contention on his appeal that the security agreement was void because it did not further any of Ollag's corporate purposes and had not been ratified by Ollag's shareholders in accordance with N.Y. Bus. Corp. Law § 908. It is clear that the security agreement did in fact serve a valid corporate purpose by attempting to avert the bankruptcy of Ollag's parent and principal customer, Deplan. Accordingly, under N.Y. Bus. Corp. Law § 202(a)(7), shareholder ratification of the agreement was unnecessary.

578 F.2d at 906-7. Accordingly, the Court rejects Appellant's contention that the transactions at issue are void under the BCL.

Nor do KI's challenged transactions constitute improper self-dealing in violation of BCL § 713, as Appellant suggests. While Ken admittedly was involved on both sides of the lease transaction between KI and Karta Corp., "No contract . . . shall either be void or voidable for this reason alone . . ." Bus. Corp. § 713(a). The Bankruptcy Court made express findings of fact, after hearing live testimony on the issue, that "Non-Debtor Plaintiffs Kenneth Cartalemi and [Maria] Cartalemi, on behalf of the Debtor Plaintiffs, and non-debtor parties KI, Global Land, and P&K, have exercised proper business judgment, and the transactions are fair and reasonable as to KI, Karta Container and P&K within the meaning of NYBCL §§ 713, 908 and 909 . . ." (5/10/06 Judgment for Plaintiffs at ¶ B). In the absence of any evidence that these transactions were anything but arms-length and objectively fair– and there is none on the record on appeal– this Court cannot conclude that the Bankruptcy Court's factual conclusions were clearly erroneous.

## Conclusion

For the foregoing reasons, the Court modifies the Bankruptcy Court's Order of April 28, 2006, confirming the Debtors' Fifth Amended Plan of Reorganization, by limiting the release of Creditor claims against Non-Debtors to all claims relating to the operation and management of the carting/recycling business operated by Debtors and their affiliates in Peekskill, New York, and, as so modified, affirms the Order.

This constitutes the decision and order of the Court.

Dated: May 22, 2006.

_____
U.S.D.J.

BY FAX TO ALL COUNSEL

15